# DEPOSITION OF BEVERLY CONYERS

```
 1        Q.   You had indicated that there were
 2   children living with you at 8 Day Street in
 3   January of 2000; is that correct?
 4        A.   Not living with me.  I was
 5   baby-sitting them.
 6        Q.   Okay.  Other than yourself, who lived
 7   there full time?
 8        A.   Nicole and Hart Conyers.
 9        Q.   So those were the three people who
10   actually lived in the apartment?
11        A.   Exactly.
12        Q.   Okay.  And Nicole was how old at that
13   time?
14        A.   Eleven.
15        Q.   Did she have a key to come and go as
16   she wanted?
17        A.   No, she did not.
18        Q.   Did she stay home alone unsupervised?
19        A.   No, she did not.
20             MR. ECHTER:  Off the record.
21             (Discussion off the record.)
22   BY MR. GARLINGHOUSE:
23        Q.   Now how old was Hart at the time?
24        A.   Hart was 19.
25        Q.   Okay.  Was she employed at that time?
```

```
 1     A.   Yes.  She worked for Popeye's in
 2  Hamden.
 3     Q.   Were you or Hart or Nicole at your
 4  apartment at any time on January 12th?
 5     A.   I was home, Nicole was in school, and
 6  Hart was at work.
 7     Q.   Okay.  Do you recall what time Hart
 8  got off work?
 9     A.   I don't think she got off until late
10  that evening because she would work split shifts
11  and she would go in like at 11:00 and work until
12  like 11:00.
13     Q.   Okay.  In January of 2000, was there
14  anyone else besides you and Hart that had access
15  to your apartment?
16     A.   No.
17     Q.   Okay.  No one else had keys who would
18  come and go?
19     A.   No, no one else had keys.
20     Q.   You said you had written something in
21  your handwriting to the attorney?
22     A.   To Attorney Polan, yes.
23     Q.   Are you talking about some notes about
24  what had happened?
25     A.   Yes.
```

### ERRATA SHEET

**CAPTION :** BEVERLY CONYERS VS. R.C. HASSETT
**DEPOSITION OF:** BEVERLY CONYERS
**DATE OF DEPOSITION:** SEPTEMBER 8, 2003

In order to make this deposition more nearly conform to the testimony, the deponent wishes to make the following changes:

| PAGE | LINE | NOW READS | SHOULD READ |
|------|------|-----------|-------------|
| 40 | 2 | 8 Day Street | 68 Day Street |

1  Q. Okay.
2  A. She wanted me to get things down.
3  Q. Okay.
4         MR. GARLINGHOUSE: That's all I
5  have.
6         MR. ECHTER: Nothing further.
7         (Time noted: 1:25 p.m.)
8
9
10                    BEVERLY CONYERS
11
12
13         SUBSCRIBED AND SWORN TO BEFORE
14  ME, the undersigned authority, on this
15  the 17th day of October, 2003.
16
17
18
19
20         DEBORAH S. VINCENT
           NOTARY PUBLIC
           MY COMMISSION EXPIRES OCT. 31, 2007
21
22
23
24
25

# DEPOSITION OF MICHAEL QUINN

1   I was involved with had different procedures for
2   different things. The state police require an
3   informant receipt, where the informant either
4   writes his informant number to keep his identity
5   a secret, or he could sign it. New Haven
6   doesn't require that.
7       Q.   All right.
8       A.   They just require a form to be filled
9   out. New Haven is fairly cheap and limited with
10  their money, whereas the state and the FBI are a
11  little bit more freestanding, shall we say.
12      Q.   So in terms of New Haven, when you
13  had -- how did you get -- You said they were
14  cheap. How did you get departmental funds for
15  use when it was New Haven that was distributing
16  the money?
17      A.   Well, we would go to the unit
18  commander or boss, usually a sergeant. In the
19  case of Ms. Conyers, it was Sergeant Canning.
20  We would request monies for whatever operation
21  we were going to partake in. You know,
22  different quantities of drugs require different
23  amounts of money, so we would -- you know, we
24  would outline to the boss what we wanted, and
25  then he would either approve it or disapprove

```
 1    it.
 2         Q.    All right.
 3         A.    And we would then receive funds for
 4    the purchase of the narcotics, and also funds
 5    for the payment of the informant's time to
 6    purchase the narcotics.
 7         Q.    All right.  So when you went to the
 8    boss to outline what you wanted for the
 9    investigation for the controlled buy, is that
10    what you're talking about?
11         A.    That's correct.
12         Q.    Okay.  When you went to the boss to
13    outline what you wanted for the controlled buy,
14    did you do that in writing or verbally?
15         A.    No, verbally.
16         Q.    Verbally, okay.  And when he approved
17    the distribution of the funds, did he do that in
18    writing or verbally?
19         A.    I believe he'd mark it on a card.
20    He'd -- like an index card that he had some kind
21    of an accounting -- accounting system to keep
22    track of the money.  They were done on index
23    cards.  Because he could give me money --  I
24    could say I want to do this at this location,
25    and then he can give me the money, and then I
```

1  could go out and try to do it and, you know, in
2  a narcotics trade, especially houses that -- you
3  know, like crack houses or heroin houses, they
4  could change day by day.
5              So we could act on the
6  information, we could get the information one
7  day, act the next day, and there would be no
8  activity there, so that money we would return to
9  the boss, and he would rip the card up.
10     Q.   All right.
11     A.   You know, not to have a hundred
12 cards -- You know what I mean? The money was
13 that strict, that the money would be returned.
14 I wouldn't hold on to the money, you know, to
15 the next day or pick another house randomly and
16 use that money which was indicated for another
17 particular job.
18     Q.   Okay. So when he actually gave you
19 the money, he would document that on a card?
20     A.   To the best of my knowledge, yes.
21     Q.   Did you see him filling out these
22 cards?
23     A.   Certain times, yes.
24     Q.   Okay. And so that would be the
25 standard procedure: Every time he gave money,

```
 1   there would be a card.  If the money came back,
 2   he could rip up the card?
 3        A.    That's correct.
 4        Q.    Okay.  What if --
 5              MR. ECHTER:  Objection as to
 6   form.
 7              You can answer.
 8              MR. GARLINGHOUSE:  Fine.  I think
 9   you already did.
10        Q.    If the money didn't come back, what
11   would then happen to that card, if you know?
12        A.    I don't know.
13        Q.    Okay.  If the money didn't come back,
14   if, in fact, you were successful in purchasing
15   the narcotics, was there additional paperwork
16   that you yourself had to fill out?
17        A.    Yes.
18        Q.    And what was that paperwork that you
19   had to fill out?
20        A.    Well, that would be at the conclusion
21   of the investigation.  I believe on that card,
22   there was another spot for a second or third or
23   fourth purchase of narcotics.
24        Q.    Okay.
25        A.    So at the conclusion of the
```

1    investigation, there was a separate set of
2    paperwork that had to be filled out.
3        Q.   Okay.  Was there any paperwork that
4    you were supposed to fill out at the time that
5    the purchase was made?
6        A.   In regard to what?
7        Q.   Well, first of all, in regard to the
8    money being disbursed, was there any paperwork
9    that you had to fill out saying on that day this
10   money was disbursed for this purpose to this
11   person, or this CI number, as the case may be?
12       A.   That would be on the card, that the
13   boss --
14       Q.   But you had indicated at the
15   conclusion of the investigation, there was
16   paperwork you had to do.  Was there any
17   paperwork I'm asking that you were supposed to
18   do on that day?
19               First of all, let me ask you
20   this:  When you say at the conclusion of the
21   investigation -- These investigations would
22   take several days; is that right?
23       A.   Could take several months.
24       Q.   Okay.  So the investigations could
25   take several months, all right.  So if the

1  investigation took several months, you'd be
2  filling some paperwork out possibly weeks or
3  even months after the events had happened,
4  correct?
5       A.   If that was the conclusion of the
6  investigation, yes.
7       Q.   So what I'm trying to ask, was there
8  any sort of investigation you were supposed to
9  do contemporaneously, close to the time of the
10 actual events, showing that money had been
11 disbursed for a controlled narcotics buy?
12      A.   Other than the initial paperwork that
13 the sergeant gave us, the money, on that day,
14 no, because the money would come back if it
15 wasn't used.
16      Q.   Did you, in fact, keep notes or any
17 other way of keeping track of how much money had
18 been disbursed on what days, so that you could
19 fill out the paperwork at the end of the
20 investigation?
21      A.   No.
22      Q.   So how would you know what to write on
23 the card if the investigation took weeks or
24 months?
25      A.   Because we're talking about minuscule,

```
 1    for the most part, amounts of money, and it
 2    would be done -- the boss would have a record of
 3    the money used on that job, so that's -- that
 4    would be our reference to the paperwork at the
 5    completion of the investigation.
 6         Q.   Okay.  When you say minuscule, what
 7    amounts of money are you talking about?
 8         A.   It could be as minuscule as five
 9    dollars or ten dollars.
10         Q.   What's the most it could be?
11         A.   It could be a thousand dollars,
12    fifteen hundred, in New Haven maybe at the
13    most.
14         Q.   Okay.  Did you ever get an amount over
15    a hundred dollars?
16         A.   Yes.
17         Q.   Okay.  About how many times did you
18    have an amount over a hundred dollars?
19         A.   In excess of probably -- maybe 20
20    times.  I don't know, in the course of my
21    10-year narcotic career, it would be a lot.
22         Q.   Okay.  And when you had amounts over a
23    hundred dollars, did you ever do multiple buys
24    with those amounts over a hundred dollars?
25              MR. ECHTER:  Objection to the
```

1   on what's been marked as Exhibit 5?
2              MR. ECHTER: Can I just point it
3   out?
4              MR. GARLINGHOUSE: Sure.
5       A.    All right.
6       Q.    Now, so what's the significance of
7   that, this number appearing here on this
8   document, if you know?
9       A.    I don't know, to be honest with you,
10  because if we were doing -- if I was doing this
11  myself, I have done it for so many years, if I
12  was making a controlled buy, I would never call
13  in and use the address I just made a buy out
14  of.  It would always be one unit, "Give me a 98
15  CN," complaint number, that is for a narcotics
16  investigation, we would use "1 Union Avenue,"
17  and that's just for the secrecy of the
18  investigation.
19             There's people upstairs that take
20  the calls that know, have friends in the
21  community that may be involved in illicit
22  activity, that may leak out that we're looking
23  at this particular spot, so to the best of my
24  knowledge, in my history, we would never -- I
25  would never use a particular address in doing

1  this.
2      Q.   So where it says, "Caller name, Quinn,
3  Michael," does that indicate to you that this
4  document is a call from yourself?
5      A.   I don't know. It's possible, but
6  that's -- it's not something I did commonly, to
7  put a particular address on it.
8      Q.   Well, this is a computer printout,
9  correct?
10     A.   Yes. It appears to be.
11     Q.   Appears to be a computer printout, and
12  normally you see this information on a computer
13  screen?
14     A.   I don't normally see it, no.
15     Q.   But you have seen it, you say you have
16  access to it now?
17     A.   Yeah, in an investigative nature. I
18  mean, we're not -- in the Detective Bureau,
19  we're not sent on jobs, we don't have a computer
20  in our car. We're not -- which is -- This came
21  pretty much way after my patrol days.
22     Q.   But the dispatcher, even in these
23  days, the dispatcher, in this case, Henrietta
24  Jackson is her name; is that right?
25     A.   I don't believe she's a dispatcher. I

1    verified by the desk officer.
2        Q.   Do you know who it's verified by?
3        A.   No.
4        Q.   You can't read that either?
5        A.   I can't.
6        Q.   Okay. In the "Property picked up by,"
7    can you read that?
8        A.   It's MMC. I believe it was Detective
9    Mark Caprale. He was in charge of the narcotic
10   evidence from B of I.
11       Q.   Do you remember logging this knowledge
12   in?
13       A.   No.
14       Q.   Based on this document, are you
15   confident you are the one who delivered this
16   evidence for the narcotics office?
17       A.   Yes.
18       Q.   Because you signed it, right?
19       A.   That's correct.
20       Q.   Okay. You testified you wouldn't have
21   called on the telephone or over the air and
22   indicated the address, 68 Day Street, if you, in
23   fact, had called in?
24            MR. ECHTER: Object. That really
25   wasn't his testimony.

1      Q.   Well, is it fair to say that you
2  testified that your practice was not to give the
3  address of a confidential narcotics buy over the
4  air or on the telephone?
5      A.   That would be my practice.  Yes.
6      Q.   That was not your practice, okay.
7           And, in fact, there's no address
8  here; is that correct?
9      A.   That's correct.
10     Q.   Okay.  I want to show you this also.
11              (Plaintiff's Exhibit 7 marked
12              for identification.)
13     Q.   Can you tell me what this is?
14     A.   That is a state evidence form for one
15  small black Zip-Lock bag containing a green
16  plant-like substance.
17     Q.   Okay.  And do you know who completed
18  this form?
19     A.   Myself.
20     Q.   Okay.  Would you have typed it up and
21  signed it or just typed it?
22     A.   No.  I typed it up and signed it.
23     Q.   Okay.  And on that form, do you see
24  the number 00-2225?
25     A.   I see the complaint number, but the

1   NEU file number, I don't believe that's
2   correct.  I believe that's a typo, a carryover
3   from the complaint number and the file number.
4   They wouldn't be the same.
5        Q.   Can you explain why that is?
6        A.   Because narcotics has their own filing
7   system of each job.  It would be 2000-001,
8   2000-002 for every case the unit prepared, and
9   that's how we're able to -- We use the
10  complaint number initially and then it will be
11  underneath the file number.  So the evidence
12  would be underneath the file number.
13       Q.   Okay.  So you're saying that on this
14  date, January 12th, you were working in the
15  narcotics enforcement unit, right?
16       A.   Yes.
17       Q.   So you're saying that there would have
18  been a separate narcotics enforcement unit file
19  number?
20       A.   Yes.  There should be.
21       Q.   Without looking at the documents, let
22  me ask you another question:  For this
23  particular investigation, okay, talking about 68
24  Day Street, that investigation was initiated, as
25  far as your end is concerned, by the meeting